Before our panel this morning is Paul Richard McGann v. Cinemark USA Inc. Ms. Horowitz. Good morning, your honors. May it please the court, my name is Carol Horowitz and I represent the plaintiff appellant Paul Richard McGann. Mr. McGann is an individual who is deafblind who is seeking access to the content of the movies offered by Cinemark. I have ceded some of my time to the Department of Justice as an amicus and in addition I'm reserving two minutes of my time for rebuttal. Granted. What is your best case? I'm sorry? What is your best case, the strongest authority to support your argument? The statutory language is very clear that people with communication barriers, with people who have sensory disabilities should have access. And the auxiliary aids provision is defined as giving people access to the visual materials and the oral information that's offered. The term is not really a visual aid because the nature of the communication is such that it basically changes what is being communicated. The notion that an ASL tactile interpreter transforms the content of the movie into a special good that no longer requires access essentially eviscerates the auxiliary aid provision. That wasn't the question though. I mean the question is whether in this case with respect to the tactile interpreter, not whether it eviscerates existing authority but whether it is a matter of fact changes the service if you will. And that question I think at least by some arises at least in part from the extent to which the interpreter can inject a certain amount of exactly that interpretation and perhaps a rendering of a certain artistic dimension to the service that is not in the actual movie itself. The ASL tactile interpreters are not rendering any artistic dimension. They are purveying the dialogue. There is by nature though an inherent selectivity involved in the interpretation, isn't there? There is an inherent selectivity only in the sense that there is so much information that some of it is superfluous. All right, so that concedes the fact that there must be a certain editorial judgment being rendered as to what should be eliminated and what should be in fact interpreted and conveyed, right? Yes, there is some judgment used in doing that. But the dialogue and the description that is purveyed is the content of the movie. It's from the content of the movie. Understood. Do I also understand that the interpreter also conveys audience reaction to the individual in addition to the content of the movie itself? If it exists at the time, they may very well interpret that as well. Yes, yes. So the interpreter really provides access to the experience, the content, correct? That's correct. Which is the whole point of it. Yes. The service offered by Cinemark is the screening of a movie that includes visual and oral content as well as the reactions of the people in the audience to the extent that they do react. One sitting in the audience would clearly be aware of that. Otherwise, they wouldn't have to change laughter. Exactly. It's a god-awful invention to start with. Exactly. They should inject that into Brown's football game. Did you follow? There's plenty of laughter in the Browns' games. It's a comedy of errors. Is there a difference between requiring effective communication between Cinemark and Mr. McGann and requiring Cinemark to facilitate the interpretation of the content of a movie? No. I think that effective communication is really communication of the content, the oral and visual content. But there's other matter to be communicated between Cinemark and Mr. McGann other than the movie itself or the content of the movie, isn't there? There may be related to concessions, for instance. Sure. And as they can see, they may actually need to provide auxiliary aids in order to access those concessions. The analysis really should be what service does the public accommodation provide and then how do we provide access to it so that the person with the disability has a like experience. Go ahead. Do you adopt the Ninth Circuit's reasoning in the Goddard case? I'm sorry? Do you adopt the Ninth Circuit's reasoning in the Goddard case? We actually adopt the Harkins case as being really very applicable here as well as the Feldman case versus pro football. Feldman seems to me to be very, very close to your case. Yes. Very close to it. Because I was amazed when I read it that I didn't even know how you would do that. Why would you communicate the commercials that come on during a football game? One of the good things that could come out of the situation is not having you subjected to those commercials. I was surprised when I read it, but that's a strong case for you. Yes. It's really on all fours. To the extent that the movie experience includes emergency information, includes information about what concessions are offered, includes the movie content itself, all of those things are things that a patron who accesses movies without disabilities has. Accessing the experience. Yes. Could Senator Mark effectively communicate the content of this movie by providing Mr. McGann with a Braille script of Gone Girl that includes descriptive elements? As you recognize, the ADA allows the public accommodation to determine. So the answer is yes? So the answer could be yes. It seems to me that the cost involved in terms of trying to determine and getting that information into a Braille format might exceed. But that's not a concern of yours, right? That's correct. How would that work? Given all that the tactile interpreter is trying to communicate to the person receiving it, how in the world would you put all that? Well, I guess you could if you can do it through a tactile transmission. I guess you could somehow take that same quantity and quality of information, reduce it to Braille, but the audience experience couldn't be the same because you couldn't put that into a Braille transcript. That's correct. You would not have the same experience. I think if you were going to do Braille, you'd probably take the descriptive narration that's offered and Braille that. But the time it would take Mr. McGann to read the Braille would significantly increase and may not be effective in terms of if there's action that's going on that's quick and things that are happening in the movie, he's not going to get that same experience of what's happening. It wouldn't be effective. But it is great that it meets that issue. I'm sorry? It's an extremely good one. I could suggest from that question that that goes to the undue burden defense. The district court never got there. No. They did not get to the undue burden defense. It's clear from the record that CentiMark would have trouble meeting the undue burden defense. Including this case with one person with $250. I'm not surprised it was that inexpensive. Usually tactile interpreters are for a two-hour spot. And somewhere around you there's two interpreters for approximately two hours. Yes. All right. We'll have you back on rebuttal and hear right now from Amicus. Thank you. May I please report? My name is Bonnie Robin Vergeer. I'm here on behalf of the United States supporting Mr. McGann. I would like to reserve one minute for rebuttal. Despite all the back and forth and analytical confusion in this case, the correct legal analysis is actually quite straightforward. The court need look no further than the plain language of the ADA. Title III provides that discrimination by public accommodation includes the failure to take such steps as may be necessary to ensure that an individual with a disability is not excluded, denied services, et cetera, because of the absence of an auxiliary aid and service. Unless the public accommodation can prevail on its defenses. That puts a burden on the head because the issue here is whether or not this is an auxiliary aid. As I was about to go on to say, the statute defines auxiliary aids and services to include qualified interpreters or other effective means of rendering oral, that's AU oral, material available to an individual with a hearing disability and qualified readers and other effective materials, methods of making visually delivered materials available to a person with visual disabilities. Are there regulations currently in force that pertain to closed captioning, descriptive audio? There's the general regulation that's currently in place regarding auxiliary aids and services and that's 28 CFR 36.303. As to my specific question, the answer no? Yes, in that those types of auxiliary aids and services are listed in section B as examples of auxiliary aids and services. Are they in 36.303? They're listed as an illustrative list of auxiliary aids and services. Captioning, I believe, was your question. Captions are listed as a type of auxiliary aid and service. Whether or not you need any particular auxiliary aid and service depends on the context and the circumstances and what is effective communication for the individual depending on their disability and the situation and so on. So there's no blanket requirement that any one particular auxiliary aid or service be provided in the situation. It all depends. Do we owe a level of deference to DOJ's interpretation here? We think so. I mean, to the extent that the regulations were ambiguous, then the court would owe deference to the Department of Justice views. I actually think, though, that in this situation the plain language of the statute is so clear, as well as the regulation, that there's probably no need for the court to think about deference to the Department of Justice views. And I just want to go back for a second to the rest of my point about the plain language of the statute. So the statute defines auxiliary aids and services. Cinemark performs the service of exhibiting movies. And a movie consists of orally and visually delivered material. A tactile interpreter is a qualified interpreter whose purpose here would be to make the movie's oral and visual material available to a person who's deafblind like Mr. McGann. And so under the plain language of the statute, the auxiliary aids and services requirement applies. And Cinemark's required to make the movie's screening accessible to Mr. McGann unless it can prevail on one of its defenses. Now, the district court here ruled that the auxiliary aids and services requirement didn't apply at all. And it reached that conclusion by making several analytical errors. And we discussed those in our brief. And I just want to highlight a few of the ones that seem most important. The courts relied heavily on this idea of access versus content. That is a false dichotomy. The whole point of this case may be generally in the insurance policy context it's not. Well, the insurance cases are just irrelevant. Those cases concern complaints about the substantive content of insurance policies like coverage for certain conditions. I'm saying in this context it may be irrelevant. But there are cases and they're out there. The bookstores have to change the inventory to include braille versions of everything they sell. In that context it makes sense. But that's not this case. That's correct. That's not this case because the whole point of auxiliary aids and services is to provide access to the content that a public accommodation is offering. The plaintiff's not seeking different content here. He's not asking Cinemark to show a different movie. That would be more of an analogy. He's just asking for a tactile interpreter so that he can access the same content that Cinemark is making available to the general public. The district court also reasoned that Cinemark does not in the normal course of business provide interpretation of movies and that thus interpretation is a different service rather than an auxiliary aid or service. And that logic is both circular and it's contrary to the statute, which as I just explained defines auxiliary aids and services and that includes qualified interpreters. Before the district court, I believe my reading of the record is that the plaintiff conceded it at oral argument before Magistrate Judge Kelly that an art gallery, for example, is not required to provide tactile interpretation. And I think your position in your amicus brief is the opposite. Am I correct? Well, I think that's putting it a little bit too strongly because as I said a moment ago, I think the exact auxiliary aid or service that might be required depends on the circumstances and it might well be that some other auxiliary aid or service could be provided by an art gallery that would be effective communication, perhaps braille brochures and other things. All right, before we get to that, that is the specific type of interpretation, is it the government's position that the ADA requires an art gallery or a concert hall to effectively communicate the content of the art or the music? Yes, that is our position. Subject to that gallery or concert hall's defenses, depending on the size and other circumstances, it might be they have an undue burden defense that would apply. But yes, the auxiliary aid and services requirement does apply. There's no exemption in the statute or the regulations for particular public accommodations like art galleries and concert halls. And we have a long history going back decades since the beginning of the enforcement of the ADA, of the Department of Justice enforcing the auxiliary aid and services requirement and a whole array of settings that are like that, museums and galleries and performance halls and so on. Did the district court apply the wrong definition of auxiliary aids? Well, the district court said that it didn't apply. It just said it didn't apply at all. It didn't apply the definition provided in the statute, right? It substituted it. Right. Instead of simply reading the statute, which clearly applies to this situation on its face, without even thinking about the regulations, it kind of went outside of that reasoning to engage in sort of a series of kind of analytical mistakes, which we run through in our brief, including this access versus content notion and the idea that interpretation is something that the public accommodation would have to provide in the normal course of business. I mean, no public accommodation does, for the most part, provide interpretation as part of the normal course of business. It's something auxiliary, as the statute says, that's provided to make it possible for persons with disabilities to participate in the activities, everyday activities that public accommodations afford, as well as other areas. I assume my time is up, but there are other mistakes that led the district court to the conclusion that that requirement just doesn't apply. Well, I've actually given you more than the seven minutes that you had originally requested, because it's not the court's practice to provide rebuttal to Amici. So you've had seven-plus here to present your position. Ms. Robin Brigier, thank you very much. Thank you. Mr. Burns. May it please the court, my name is Michael Brett Burns, and I represent Cinemark in this case. The district court properly rejected plaintiff's arguments that Title III requires it to provide individualized interpretations when exhibiting movies for its deafblind customers. Mr. Burns, let me start where I left off with Amici Counsel. Didn't the district court apply a definition from a dictionary as to what auxiliary aids mean, as opposed to the definition provided in the statute? I don't believe it did. I believe it provided both. What did it say to Webster's then? I believe it provided both. It certainly did look to Webster's whenever explaining when the auxiliary aid provision comes into play, but then it also specifically applied the definition of auxiliary aid, that is auxiliary aids are required in order to facilitate effective communication between the individual and the place of public accommodation in order to facilitate access to the typically provided goods and services, which in Cinemark's case are movie exhibitions. Was the dictionary definition used for purposes of the word auxiliary or purposes of the term auxiliary aid? All right. Well, the opinion will speak for itself. Yes. I don't know of any case where there's been a statute that defines a term using the statute and the judge looks to Webster's dictionary or Oxford dictionary or any other dictionary for that matter to figure out what Congress intended as opposed to relying upon the definition of the statute. Have you ever seen a case like that? I've never seen one before. I can't cite a case exactly like that, Your Honor, but I can point out as I answered to Judge Restrepo that I believe that the court not only looked at the Webster's definition of what an auxiliary aid is, but it also looked to see the specific regulatory context of when they are required and when they're not and for what purpose they are required. Let's look at the regulation. 28 CFR 26.303 sub B is example. The term auxiliary aids and services includes. And then there's a subparagraph one, subparagraph two, three, four. You look at subparagraph one, subparagraph two, subparagraph three or subparagraph four. This fits really good in the definition. Exemplified in the 36.303. How do you get around that? The way I get around that is this. I do believe that and concede it to the district court, and I believe the district court further concedes that there are situations where tactile interpreters can, in fact, be auxiliary aids. What are they? For example, if a person with a disability required an auxiliary aid in order to access the typically provided goods and service, hear the movie screening, they might need an auxiliary aid to understand which movies are being shown. This is an insane argument. I've got to tell you. What I'm going to do is concede to you that the service provided by Cinemark is access to the theater and access to the concessions. So they can buy a ticket, they can buy popcorn, but they can't see the movie.  You're not really making a good argument. Can you please tell me that, Irina? I'm not making the argument that you just said. I'm saying that the good and service that Cinemark provides is exhibiting movies. So in the context of auxiliary aid, I believe, and I believe the district court correctly found, that Cinemark has to provide information through possibly a qualified interpreter, possibly a tactile interpreter in order to understand what the customer can buy, how much that item costs, and how they are to go to see the movie. They've got to tell the customer what they can buy and how much it can cost. So they've got to let the plaintiff here, Mr. McCain, know what movie is showing, how much it's going to cost them to get in. Yes. That's what they've got to do. That's what they have to do. And we know that. And that's it. We're not arguing for that. Can I ask, please? You say that what the ADA requires for a movie theater is to let the impaired person know what movie is showing and how much it's going to cost them to go in, even though they're not going to be able to see anything or hear anything until they get in? They don't have to pay to get in to buy the popcorn? Is that what you're saying? That's one example. And the reason that we know that one example is from the DOJ's own guidance, because when the DOJ issued its own TAM supplement, it provided the example of Listen to yourself for a second. Listen to what you're saying. Does it make any sense? Forget the law. Forget the CFR. Just use, I know it's not often referred to in law, common sense. This is something we're talking to a four-year-old who's relatively fluent in English. And you're trying to explain to the four-year-old what the business of a movie theater is. And you tell the movie theater, Johnny or Sally, whatever the hell your name is, movie theaters and movie companies are there to make sure that the people, the public know what movie is playing and they know how much it will cost for them to see the movie. And maybe they have a right to go in to buy the popcorn. And that's it. That's what your argument is. And to provide the exhibition of a movie. Okay. That they can't access. So they can't see. They can't access. They can't see or hear. But that isn't. Do you help them find the chair? I'm sorry? No, they're inside. They can stand up. We know this because one of the examples that the DOJ has given us and that regulated entities like Cinemark have relied upon for years is the restaurant hypothetical. The DOJ specifically says that whenever a customer goes to a restaurant, they have the right to access the typically provided meals and drinks that the restaurant serves. This isn't a restaurant case. Distinguish the FedEx case and the Arizona movie case for us. And Feldman. I'm just saying Feldman. The Harkins. The Harkins and the FedEx field case. How do you distinguish your facts from those opinions? Or you can tell us those opinions are wrong. Sure. Let's start with Arizona versus Harkins. In Arizona versus Harkins, the plaintiffs sought access to standardized closed captions created and provided by the movie studios. And they were provided by the movie studios in a technological way that could benefit all members of the audience. They could not secure the captions when attending the movie at Harkins because the plaintiffs in that case were dealing with a movie theater company that did not purchase equipment that would display the captions. The Harkins plaintiffs did not ask for individualized interpretations of the movie, nor did they seek to require Harkins to create the captions or to hire someone to effectively create the captions. Or they also did not ask someone at Harkins to provide an individual sign language interpreter to the extent captions weren't available. They simply sought to require Harkins to provide equipment to allow patrons to access closed captions the movie studios were already provided. And they were already embedded in the technology that was being displayed to everyone else. So for that reason, I think it's a very different thing. How are you with Feldman, the fourth circuit case and the football game? Is the fourth circuit case better running in that case? I believe that Feldman is different for multiple reasons, but the two biggest reasons that Feldman is different are, number one, unlike Cinemark, which displays movies that are created by movie studios and it doesn't have the ability to control the content, Feldman, in the Feldman case, the defendant owned the football team, owned the football stadium, and was responsible for all of the content that it put out. But I think more importantly... If he was responsible for the content they put out, would the ADA require them to make that content available to someone who could not otherwise? I think arguably the auxiliary aid is effective communication. If that's auxiliary aid in communication, why isn't this auxiliary aid in communication? He's inside, caught the ticket, he knows how much he had to spend to get the ticket. He's inside, he's sitting there, he wants to see and enjoy the goods and service that your client has a business of providing. That's part of the business. Because it's not our content. Wait a second. Because the movie being exhibited is not our content. It's the content provided to us by the third party movie studios who are not part of the studio. So if I can't see, and I go to the local newsstand, or some situation where I'm trying to read the New York Times, Public Fiber, let's say, because it's not as prominent. But I think you can see that real interpreters would be required to help a non-sighted person read the newspaper. No, I think that walks right into the DOJ's express prohibition against making someone do something to regulate the content of the goods and services that they provide. That's the DOJ's bookstore example. Then why are interpreters ever required? Why does 303 specifically say that interpreters are an example of non-judicial service? I believe it all turns down the way that this can all be reconciled. In fact, the way that multiple circuits have reconciled this is by focusing on the access versus content distinction that we briefed. And those multiple circuit courts have recognized that it is the obligation of a place of public accommodation to provide access to the place of public accommodation and access to the typically provided goods and service. So I have access to the newspaper, but not to the content? Is that what you're arguing? That's right. I can touch it, but I'm okay. According to the DOJ's own regulation that recognizes that a bookstore, for example, is not required to stock railed books. That's very, very different. They don't have to change their inventory. But if, the cases say, if they have the practice of ordering books not normally stocked, they cannot then say we're not going to order a railed book that's not normally stocked. Do you concede that the ADA requires closed captioning and audio, descriptive audio? I concede that the DOJ has promulgated rulemaking that states that, in their opinion, it will be required prospectively, and because of that DOJ rulemaking, Cinemark and other members of the newspaper industry has voluntarily provided that in advance of the prospective rule becoming final. I also believe, though, Your Honor, that that's an important point because we're talking about captioning. We're talking about something that, at least in my opinion. Because it's literal? It's literal and it's movie studio provided content embedded in what we already exhibit. So I think it's already closer to an auxiliary aid. But even then, the fact that the DOJ put captioning through notice and comment rulemaking is an implicit recognition that a change in the law needed to be required to get this out of access versus content. And I don't see how we get this tactile interpreter issue out of access versus content in a way that doesn't disturb earlier decisions by the Third, Fifth, Seventh, and other circuits. And while I understand that plaintiffs have made the point, and I believe Your Honor, Judge McKee made the point, that the foundation for those cases involved insurance policies, the fact is those cases took on intellectual policy considerations that went far beyond that. They got into the vagueness of the regulation, the ability of regulated litigants to rely on what the Department of Justice has said. And one of the examples in the Seventh Circuit's opinion is specifically that under the law as it exists now, the same law that exists right now that we're talking about today, an individual movie theater would not be required to provide an individualized sign language interpretation to a deaf customer. And so if the Seventh Circuit Judge Posner is right about that, that's our case. I still come back to Feldman. As I understand, you're saying in Feldman it's not the case because in Feldman the owner had to provide it? In Feldman it was the owner's content. So it would be, I guess, a conceptually similar situation to 20 years ago before the antitrust laws hit when Sony both made the movies and then owned the movie houses that showed them. Arguably, you would have a Feldman situation there. But even more important, and I started to mention this earlier and veered away from it, Feldman didn't get to fundamental alteration. And as we know, fundamental alteration is a defense to a challenge to provide auditory aid. How is this a fundamental alteration of the product? Because it's not something that we normally do when it comes to individualized interpretations. We show the movies. We don't guarantee that people understand them, laugh at all the jokes, get all the points of the movies. Well, you can't guarantee they're going to laugh at all the jokes.  But, Your Honor, I would say that, and I know where you're coming from, I think we're both talking about the footnote near the end of the decision where the court said, and you've not mentioned it, but then the court said, access versus content is a play on fundamental alteration, and that provides an alternative basis for justifying this decision. So I think fundamental alteration is a winning defense for us, and I think it's also a defense that the- Your Honor, I mean, they sued the wrong party. They shouldn't have sued the operator of the theater. They should have sued the person who has the movie rights. Is that what you're arguing? They're in a tough situation, and I recognize this because, I guess, to be fair to your question, I don't believe they can sue the movie studios because the movie studios aren't places of public accommodation. It's a very unusual situation where you have the content provider on one hand, the third-party content provider. You have the place of public accommodation, and then you have the- The Congress focused the obligations on the places of public accommodation. Doesn't that answer your question? That's what exactly the Congress had in mind? You go after the movie theater, not the person who produced the movie or the person who has the movie rights? I think you go- I think the answer to that question is you go after the movie theater and require them to provide access to the good, but you don't do that. That's what is driving- But you don't do that. They're satisfied with that. What do you mean by access to the good? The way that they can sit, maybe not sit. That was different stuff. They may not be required to furnish a chair, but they get inside the theater. That's it. They get inside. So this is really great for the theater. They get to take the money they don't have to show in the movie. That's what you're arguing. Let me try it this way. Where does Cinemorph's obligation end? Once the ticket is purchased, where does the obligation end? Providing Mr. McGann the ability to purchase the ticket. Okay, so they buy the ticket. What's next? To know what movie he's seeing and how much he's paying for it. Okay, tell him he can go see Gone Girl. It's going to cost you $7. What's next? To understand how to get into the theater and choose a seat. Okay, so help him find a chair. To the extent that he's needed. So he's seated now. Is that where the obligation ends? And then we exhibit the movie. And that's what ends? Yes. You're saying he can't see it or hear it. That's where the obligation ends. Those are his limitations. I understand where your client's obligation ends. Yes. I understand that he can't hear it or see it. The obligation ends when he sits down. That's your position. That's my position, and that's consistent with the DOJ's own bookstore regulations. Mr. Burns, before you wrap up here, we're all aware that the district court did not address the fundamental alteration defense in this case. Even if we were to rule contrary to your position on what constitutes an auxiliary aid service, would it be appropriate for the case to go back to allow the court to undertake fundamental alteration, or are those two issues so inextricably intertwined that the courts effectively dealt with fundamental alteration? If this panel concludes that the court did not reach fundamental alteration, then I understand, based on Judge McKee's point earlier, that it could conclude that. That footnote is ambiguous. I believe there are two different issues. I believe the issue we've been talking about largely today is whether or not the district court got it right with respect to the definition of auxiliary aid. But if it's your conclusion, the panel's conclusion, that in fact the court did not reach fundamental alteration, then I believe any remand should ask the court to consider both fundamental alteration and undue burden defense. All right. Thank you very much, Mr. Burns. We'll have Ms. Horwitz back for rebuttal. Thank you. I just want to clarify a couple of points here. It is true that I conceded at the lower court level that the art gallery does not have to provide a tactile interpreter to convey what is shown in a painting. I think that it's possible that the art gallery will be able to purvey the same information using a different auxiliary aid. It is not that the art gallery does not have to provide auxiliary aids. It's a question of the art gallery being able to choose what will provide effective communication of the oral and visual content that it's purveying. And tactile interpreters may not be necessary in that case. As to the question of who provides the content, the real question is what service is provided. And so here Cinemark provides service to the public that includes the oral and visual content of the movie. The public would not come and sit in the theater and not be able to access that oral and visual content. They'd be asking for their money back if there was nothing shown. Well, they wouldn't get it because Mr. Boren's client has given them the ticket and gotten them inside and let them sit down. They wouldn't get a refund if they had another blue interpreter. And that would be a problem. It's important that people with disabilities, the whole notion behind the ADA is that people with disabilities are integrated into the social and economic mainstream of society. And that means being able to access the same content, the same services that people without disabilities can access. Feldman actually had content that was produced by others. For instance, in one of the footnotes it references Jive Records as producing the lyrics from some of the music that was going to be accessed. Some of the commercials were not, some of them may have been produced by the NFL, but the vast majority, I'm assuming, was sold to the NFL. But there wouldn't have been, some of those commercials and some of those I see when I spend time watching football, it wouldn't have been owned by the NFL. And what team is that? Team, we called it a team, thank you. Let's just talk on, I'm curious. Chief Judge, let's question to your opposing counsel. Are we in a position to deal with the footnote and the alteration issue? I believe we are here. Because the court said that the fundamental alteration is coextensive with this access versus content issue. So it considered the notion that you only have access to a good and not that the change would require something that's a modification. That would be a fundamental alteration. It's very clear that there is nothing here that has changed. The significant modification that it would take to rise to the level of a fundamental alteration simply doesn't exist. Deceding is not a problem. Having an empty seat on either side of the person they're conceding is not a problem. It is not a problem. There are other cases that say that companions can sit together with wheelchair users. This would be a similar situation if you needed a modification in policies. But in the case of Gone Girl, in this case, all of the time, every showing, Mr. McGann would have been able to sit together with his tactile interpreters. Thank you very much, Ms. Horwitz. Thank you. Yes, I would ask that we have a transcript prepared of this oral argument and that the parties share the costs thereof. Thank you very much, counsel. Thank you, both sides, and to the Department of Justice. A very well-briefed case, fascinating case, one of considerable interest and importance. We thank you all for your contribution.